Good morning. Our first case for today is Exelon Corporation v. the Commissioner of Internal Revenue. Mr. Clement. Good morning, Your Honors, and may it please the Court. Paul Clement for the Appellant Exelon. When Exelon sold its fossil fuel plants, it received expert advice on reinvesting some of the profits in the energy sector. The tax court not only vitiated that effort to defer taxes on the sales through a like-kind exchange, but upheld almost $90 million in penalties based on at least three fundamental errors. First, the tax court applied the wrong legal test to determine whether the purchase option in the sublease was so likely to be exercised as to render both the option and Exelon's ownership a loser. Second, it wrongly dismissed Exelon's reliance on its advisers' opinions based on communications between Winston & Strawn and Deloitte that were not improper, let alone so obviously improper, that Exelon should have known they undermined the appraisal. And third, the tax court misunderstood the sublease return conditions in concluding that compliance with them would be unduly costly. These three errors rendered the deficiency invalid and the penalties wholly misplaced. First, the tax court applied the wrong test to evaluate whether the purchase option was a real option. The test that the IRS itself applied at the time and this Court has applied in cases like M&W Gear is the right test, namely whether or not the option is essentially illusory. Was that a tax case? M&W Gear is a tax case. It's M&W Gear v. Commissioner. My friends on the other side suggested it's not a tax case. I'm just not sure what they had in mind about that. It's, as its very name suggests, it is a tax case. Was the issue the same as the issue here? It's not exactly the same issue, Your Honor, but I do think that it's this Court's test. I think it's the most relevant precedent from this Court. But more to the point, I think it's also right because the test in these cases should look to whether the option is essentially illusory so that Exelon's ownership interest is also effectively illusory. And so if the option is really a false option and there's no question that just to take the Texas example, CPS will repurchase at the end of the sublease, all right, well, then we didn't have an ownership interest. But if it's only reasonably likely, which is the standard the tax court applied, that's what an option is. I mean, and, you know, we could ask what reasonably likely means. I mean, if there's a 40 percent chance that CPS would repurchase at the end of the lease, is that reasonably likely? I suppose so. How about 60 percent? I suppose so as well. But if there's a 40 to 60 percent chance that CPS won't exercise the purchase option at the end of the sublease, then Exelon plainly has an ownership interest in the plaintiffs because there's a 40 to 60 percent chance that they're going to end up with 100 percent ownership after the sublease term has expired. So I do think that this court, even though it's a different context, essentially has it right in M&W gear that you should be looking for something that is either economically compelled or very close to it. I mean, you know, if you want to say, you know, if the test is not reasonably likely but overwhelmingly likely, I think that gets at what the test should get at. But as the tax court applied it, the purest of all options, which is, yeah, you know, it's about 50 percent that the party will exercise its option, about 50 percent they won't, that would be reasonably likely and that would deprive us of our risks of ownership in a way that makes absolutely no sense. Mr. Clement, I'd like to ask you about the definitions of capacity factor and availability factor. So my problem here is that in your brief at page 46, the way that you define capacity factor and availability factor really sounds an awful lot like the way the Stone and Webster definition is, the way the Exhibit B to the lease is. Explain to me why estimated annual capacity is really availability by your own definition. Well, Your Honor, I think the way to understand that is to say that that definition in the context of return condition would be best understood by people in the industry as an availability factor. I think if you just sort of peel that out and look at it in the abstract or compare it to what Stone and Webster was using in a very different context, I can understand why you might say, yeah, this actually looks more like a capacity factor. But I think the people in the industry, and this is what the amicus brief says, and this is what if there had been any testimony on this, the testimony would reveal, that people in the industry would look at that contextually and they would say, of course it's an availability factor, or maybe an adjusted availability factor is what it probably was, because we'd never expect to see a capacity factor in a return condition, because a return condition by its very nature is something that the operator can or the sub-leasee can control. And everybody in the industry understands that capacity factor is outside the control of the operator. But you can still predict depreciation. You can still predict market factors. I mean, even though those are guesses, right? I mean, you can still make predictions, and presumably one would want to before making an investment. Exactly, Your Honor. But there's two different contexts, right? There's Stone and Webster when they're evaluating the original investment. Deloitte, when they're trying to assess the value of the plants based on discounted cash flow. Of course, they're going to look at capacity factor, and those are going to be based on guesstimates. And if this definition appeared in that context, you know, I still think it would be ambiguous in the industry and you'd want to have evidence, but it might well be understood as a capacity factor. But as a return condition, it just doesn't make any sense, and I don't think the tax court understood it correctly, because the tax court thought that the return condition, estimated annual capacity, was something you could sort of throw money at and you could get the plant sort of up to snuff. And capacity factor doesn't work that way. I mean, availability factor does, but you can, you know, by spending more money on maintenance or repairing some boiler that's broken, you can get the plant sort of up to snuff. But if the market has shifted, for example, you know, the people who were negotiating this contract could not have anticipated fracking and what that would do to the cost of natural gas and what that would do to the capacity factors for coal-fired plants based on factors entirely out of the plant operator's control. And so, again, I understand the question. I understand why looking at it in the abstract you'd say, gosh, I don't know. I mean, that looks as much like capacity factor as availability factor. But I think, and this is where I think the amicus brief is coming from, and this is what the testimony, I believe, would reveal if there had been any, is that the people in the industry looking at that would say, no, that's a little ambiguous, but it must be an adjusted availability factor because otherwise it doesn't make any sense. I think you also get that sense if you look at, you know, the Deloitte report, and this is on appendixes page 165 and 166, I think are the most relevant pages. When Deloitte's looking at this and trying to estimate the discounted cash flow, they have separate lines for availability, adjusted availability, and capacity factor. And they nakedly and unambiguously have this line for capacity factor, and the reason I picked these pages is because this is 31 years out, which is when the sublease expires. They have numbers like 58.7 percent, and then if you look at the next page, those numbers are down to 49.6 percent. And so if the tax court were right that capacity factor and estimated annual capacity both mean capacity factor, then Deloitte's appraisal is just internally inconsistent. I mean, it's facially inconsistent because, you know, they do specifically tell you what capacity factors they were using, and they're nowhere near 82 percent. I get that. It just seems that when so much rides on these terms, and it's a condition in the lease, it's almost like you're saying, well, in the industry, everybody understands that sometimes green means green, but in this particular context, it meant red. Why wouldn't one be precise about language when this much money is at stake in the deal? You know, as with almost any contract I've ever seen, after the fact, when an issue's arisen, could you be more precise about it? Absolutely. But I think I would sort of turn that around and say, when this much money, a $423 million deficiency and $90 million in penalties rides on it, why wouldn't you get evidence about this? Why would you not meet? Just to put this in context, I mean, the tax court says on pages 143 of his opinion and then 171 of the opinion that Exelon must have known. This would have been obvious to Exelon. Well, there were multiple, multiple Exelon witnesses, none of whom were asked about this topic. And on page 143, the tax court says CPS, in the context of the Texas Spruce lease, also must have known this. Well, there was a CPS witness, and he wasn't asked about this, not by the IRS and not by the tax court judge, who was not shy about asking witnesses about other questions. And so I get that, like, in the context of a transaction of this size, it would be better if this were written more clearly. I mean, I wish it had been. But in the context of these deficiencies, I think the taxpayer is at least entitled to be able to put on some evidence and, you know, and have the relevant witnesses at least testify to what this meant in context. Did you seek rehearing on this basis? We did not seek rehearing on this basis. So if the judge got it so wrong, why didn't you try and why didn't your client try to get the judge to look at it the way you're now looking at it? I think, Your Honor, we considered the possibility. I think there were a variety of factors, including timing and the concern that this, you know, we're talking about the 1999 tax year, and I think we were just concerned that seeking reconsideration would put us in the Seventh Circuit in 2020 or something. But with all due respect, I don't think there's any rule that suggests that we lose this issue. No, I'm not suggesting you waived anything, but I'm just suggesting that if you think a judge just totally misapplied a term, as we've been discussing here, you would normally give that judge a chance to look at it the way you think he got it wrong. Well, I understand why you often would. Maybe I'm talking as a trial judge who likes to get a second bite at death. I can understand your perspective, Your Honor. I also think, in fairness, though, we do think there are these other fundamental errors, such that I think even if we could correct this one error, we still think the tax court was applying the wrong legal standard. We still think that he made a, you know, an equally egregious mistake in faulting Exelon for the possibility that Winston and Strawn crossed some line in its communications with Deloitte. And at least as I read the tax court opinion, you know, sort of the critical elements of its findings as to both deficiencies and penalties turns on this return condition. It does turn on the standard because he's clearly applying a reasonable likelihood standard. And the third thing it turns on is this perception that there was something nefarious between Winston and Strawn and Deloitte. And there, too, there just is a complete absence of evidence on this. Before we get to the penalties, I'm just having a real problem with the notion of reversing a tax court finding of fact that Exelon had no indicia of ownership after 13 days of trial, forgetting all of this terminology argument and everything else. He found as a fact that he didn't have any indicia of ownership. He had no responsibility to maintain the property. You funded the option price. You paid them $88 million in one case to do this deal up front. The chances of default by the lessees was nil because one of them was a municipality, San Antonio, and the other one was prohibited by Georgia law from declaring bankruptcy. So there was no risk, really no risk at all in that. So forgetting about all this terminology, how do you get around those findings of fact based on a clearly erroneous standard? Well, Your Honor, a couple of points. One is I don't think in the end that's what the tax court rested its decision on. It made observations about some of those factors, but when it comes down to what the decision rests on, I think it really does rest on the Winston and Strawn opinion and his misunderstanding of the return conditions. And I do think it's important to understand how critical the purchase option issue is because it really does undermine the other things that you've referred to. Because if there's, let's say there's a 50% chance that the purchase option, repurchase option, is not going to be exercised. If that were recognized, I don't see how you reach the conclusion that we had no risk. Because that means that there's a 50% chance that at the end of the sublease, we're going to own these properties outright. And the circumstances in which CPS would not exercise the sublease, repurchase option, is precisely when the plant is substantially below, the fair market value of the plant is substantially below the repurchase price. And so if this plant at the end of 30 years is only worth $200 million, then CPS is going to walk away from it. We're going to be stuck with it. And at the end of the day, we're going to have lost like $100 million on this investment. And how that's not a real risk. And that has nothing to do with bankruptcy. I mean, you know, I think bankruptcy risk, even if it's unlikely, is still a risk. I mean, that's the hallmark of ownership. You know, and it doesn't make a lot of sense to me to say I have to contract with somebody who's likely to go into bankruptcy before you recognize the risk that I could be stuck holding the bag if my counterparty goes into bankruptcy. But you're contracting with two entities that basically will never go into bankruptcy, for the reasons I mentioned. How do you get around the fact that Exelon represented to its own board that it was scheduled to receive the fixed price option at the end of the lease term? I don't think they were told that, Your Honor. We addressed this in the- I'm reading it. That's a quote. I think what you're reading from is the cash flow estimate that was part of the package that went to the board. And if you're talking about cash flow, I think you're absolutely right. There were two times when they could possibly get cash flow. And it was at the time that they got 80% of the purchase price back as a prepayment of the lease. And the second time is with the repurchase option. But that same packet later in it had something that made crystal clear that it was an option and that it wasn't guaranteed. So I think if you read that whole package, you would not come to that conclusion. And I think I'm running into my rebuttal time here. The last thing I'll say about the risk of bankruptcy is I'm sure some people didn't think Puerto Rico would go bankrupt. Some people didn't think we were contracting with Detroit, a municipality. How could this possibly go wrong? Here, some of the investments were with AIG. What could possibly go wrong with that? The real risks here that Exelon took, but the most dramatic of them is that it could be stuck owning this property at the end in a reality where the property was worth substantially less than the market value at the time. And I would just underscore that, you know, it's ever true in some of these other cases where you have, you know, a tobacco company buying a waste treatment plant in Holland. Like, this is a case where if Exelon ended up with a Texas power plant, it would know what to do with it. And this is a sector of the economy where a valuation 30 years out almost can't be locked in in a way that eliminates risk. I mean, this whole case started when my client thought they were going to sell their fossil fuel assets for $2 billion and ended up within a matter of months selling them for $4 billion. So the idea that 30 years out you could predict absolutely that the fair market value of these properties would be greater than the purchase price options such that it was essentially locked in, that CPS would end up with these properties, I think is just mistaken. Thank you. I'll give you an extra minute because we have an extra, I think Judge Manion has a question, too. Well, it's very brief. It's about half the time is run. And now there's this issue about coal and any future of that. And that would probably have an impact on the value of coal-fired plants, wouldn't it? It absolutely would, Your Honor. I mean, you know, not to put too fine a point on it, but if the last presidential election had gone the other way, the value of a coal-fired plant would be substantially less than it is, given what has happened with coal regulation as a result of the election that just happened, which just underscores why it really is fanciful to think that the fair market value of this is locked in, in a way that, of course, the CPS would exercise the option. And to maybe use the other 30 seconds of my extra minute just on the penalties issue, I mean, I do think whatever you determine on the deficiency, I think the penalties requires an even greater finding because it requires a finding for which there's no evidence. If you look at 171 of the tax court opinion, there's no evidence to support the idea that Exelon would have obviously interpreted the return condition the way the tax court did. There's no evidence that Exelon would have understood that Winston and Strawn crossed a line with Deloitte. And we also think that the tax court, with respect, applied, even if you think that the tax court applied a better standard based on subsequent federal circuit decisions, I mean, clearly, the standard that Deloitte was using in its appraisal, and I think Exelon was allowed to rely on, was an economic compulsion standard. Has your client paid yet after the tax court judgment? Or has your client still not yet paid the deficiency and penalties? I actually don't know that answer, but I'll try to get it for you for rebuttal. Okay, thank you. Thank you. Mr. Christensen. Good morning, Your Honors. Jacob Christensen for the United States. May it please the Court. The sell and lease back transactions that Exelon engaged in in this case are like all the other tax shelters that the courts have almost unanimously rejected in other cases. The other LILO and SILO cases specifically have been unanimously found to not muster, that are past muster under the substance of reform doctrine by every circuit court that has addressed and considered those transactions. I do want to discuss for a moment the return conditions. This was one of the basis of the tax court's decision. It certainly was not the only evidence before the tax court that led it to conclude that the lessees were reasonably likely to exercise their purchase options. But with respect to the return conditions, the tax court simply did not misunderstand what they required and that the return condition for estimated annual capacity did, in fact, refer to the plant's capacity factor. The court need only look at the plain language of the return condition itself to arrive at that conclusion. Could you respond to Mr. Clement's point about the tax court not pressing on this issue and asking questions about it? He says that there was some ambiguity and if this was that important to the tax court, the tax court would have been pressing on this issue during the trial and it did not. The evidence actually includes substantial testimony from Exelon's experts regarding capacity factor. The evidence exists in Deloitte's reports regarding the declining capacity factor. I think what the tax court did is it relied on that testimony from Exelon's own experts with respect to what the meaning of capacity factor is and Deloitte's own reports to reach its conclusions. I don't know that there was a lot of back and forth questioning from the tax court on this particular issue, but there was substantial evidence regarding the meaning of capacity factor and what that meant. For example, again, the return condition for estimated annual capacity refers expressly to actual generation and there's no dispute between the parties. Both Exelon and the amicus agree that measuring actual generation is a measurement of the plant's capacity factor as opposed to availability factor, which instead measures how often a plant is capable of running. Was that the definition on which the tax court operated about how it actually operates for capacity factor? Yes, Your Honor, and that's what the return condition states, is that the facility can reasonably be expected to have an annual ratio of the actual net generation to the normal claim capacity of at least 82%. And so just looking at the plain language of the return condition, it's an express reference to the actual operation of the plant. And there's no dispute that capacity factor measures actual generation. And again, these definitions for all of the return conditions were lifted from the Stone and Webster engineering report, which defined capacity factor using the exact same terminology. And also, there was a separate definition for equivalent availability, which used the exact same terminology that's used in the return conditions for the second return condition, which is net energy output. So the definitions included in the return conditions were lifted from Stone and Webster's own engineering report. If the court is looking to what the people in the industry understood capacity factor to mean, the court need go no further than Stone and Webster's own engineering report, which defined those terms. Would it have been odd for a lease to include that term at all, given that it does involve projections about market and things that would be difficult to predict? It does include, I agree, capacity factor can be impacted by market forces. A moment ago, I referred to testimony from Exelon's experts, which relates to this topic, because the capacity factor certainly is not unrelated to the physical condition of the plant. In fact, capacity factor can be managed by a plant owner, at least according to Exelon's experts. Dr. Myers, one of Exelon's experts, explained that the declining capacity factor, which meant that the actual hours that a plant would operate would gradually decline over the lease, was due to the gradual obsolescence of the plant. Was that meaning of demand, or the plant doesn't run as well as competitors? Anything that gets older declines, I suppose, but some of these plants are pretty old. I want to draw the distinction between maintenance and deterioration and obsolescence. Was coal obsolete? Well, it could become more obsolete in the future. I think that could have been part of the declining capacity factor. The point was that if the plant owner does not continue to replace components of the plant that become obsolete, then the capacity factor will continue to decline. But the owner does have control over the capacity factor in that the owner, as parts of the plant become obsolete, the owner can invest and replace those components of the plant to make the plant more competitive. And that is precisely what John Reed, another one of Exelon's experts, explained in his expert report. He stated, and I'm going to quote, this is the supplemental appendix, page 395. He states that a plant's capacity factor can also be affected by the ability or lack thereof to retrofit existing equipment to remain competitive, i.e. avoid technological obsolescence. So that is what the tax court was focused on, that MEG and CPS would be required to make significant investment to retrofit and upgrade the plants as they became obsolete. And by doing so, they could manage the plant's capacity factor. Well, and also if the market had changed, then Exelon was insulated, even if in ways that one could not predict at the time the lease was entered, setting the capacity factor high still is a way of insulating against the risk. That is exactly right. And hence another purpose for including that return condition was to help Exelon shift the risk of obsolescence and a declining capacity factor to the lessee's and away from itself. And I want to quote just to be sure that this is indeed what the tax court understood. On page 171 of the court's opinion, the court stated that petitioner, as a sophisticated power plant operator, must have appreciated that it would be very expensive for CPS to sufficiently upgrade the plant to meet the capacity requirements. So the court repeatedly refers to this concept of obsolescence and the requirement that the lessee's, in order to maintain a sufficiently high capacity factor, would have to upgrade components of the plant as they became obsolete. So somewhere along the line, one of them did actually open a new plant. I don't remember where that was. It may have been in Georgia, but alongside the other one, or at least approximate of the same customer base. But, of course, that customer base was obviously growing substantially. And that's where I get confused when we talk about capacity factors. It's based on demand, how much you actually operate. What is the customer demand, I guess. Right. And as the plant owner prevents a plant from becoming obsolete and retrofits parts that have become obsolete, it makes the plant more competitive so that it will actually be called on more to deliver energy more frequently. And the tax court's findings in this regard are supported by Exelon's own expert testimony and by the Stone and Webster report, which defines what capacity factor means. And, of course, the sublease return condition explicitly refers to actual generation. Mr. Christensen, I have a question that goes to penalties. In the PWC letter, they flagged to Exelon that one of the risks here is the tax risk, that the IRS would disallow it. But PWC also says in the highly unlikely scenario that the entire like-kind exchange was overturned. So they're hearing from their tax advisors that it was unlikely. Yes, there was this tax risk, but they're also hearing that it was highly unlikely. So why, then, is it supposed to be glaringly obvious to Exelon? Just in response to that, Exelon itself actually registered these transactions as tax shelters. And at the time, the definition of tax shelter meant it referred to a transaction that a significant purpose of which is the evasion of federal income tax. So Exelon itself registered these transactions as tax shelters. But a tax shelter is not necessarily illegal. It's not necessarily disallowed, is it? Well, according to this definition, where you have a transaction, a significant purpose of which is the evasion of federal income tax. Well, if I sell my house and I want to put all any gain that I've made in the house into another house so I don't have to pay tax on it, people do that, right? There's nothing wrong with minimizing your tax burden. Right. I agree with that, Your Honor. And I think that these transactions cross the line. The IRS, in a revenue ruling issued in 1999, in March of 1999, before these transactions occurred, addressed the similar LILO lease-in, lease-out tax shelter transactions and warned that the IRS would challenge those in similar transactions. And as I said before, this, you know, the LILO transaction was repackaged as the SILO after— Yes, SILO is sell-in, lease-out. Okay. And LILO is lease-in, lease-out. Well, there's not—when you talk about tax evasion, isn't there a difference between that and where you defer? Those taxes are still going to be owed, but they're now consumed in the new plants. But when those plants are sold or whatever, then that's going to have to be realized, isn't it? Yes, if there were a deferral at the end of that— Yeah, but it's not really an evasion. There are times when you can defer when a tax becomes—when you have to realize it. Obviously, if a company buys another company and pays for it with stock, then generally the stock that's exchanged incorporates the gain without having realized it. Yeah, the problem with these transactions is that the taxpayer was not entitled to that deferral but was required to recognize the income from the sale of its plants in 1999, you know, unless the transactions actually did confer or transfer genuine ownership in the out-of-state plants to Exelon. But again, the evidence is also replete to support the tax court's finding that Exelon always expected the lessees to exercise their purchase options. Counsel, so they're not entitled to rely on their accounting advice, that it's highly unlikely that the tax— I mean, I understand everything you're saying, and I understand that your position is that this silo transaction was fraudulent from the beginning. I get that that's your position. But if they're being advised by their accountants in good faith and have a good faith belief, why isn't that some support that they were entitled to have a good faith belief that, in fact, that this way of managing the gain would be permissible under the code? So the tax court found that Exelon, as a sophisticated plant operator, knew or should have known that Winston and Strawn's tax opinions were flawed because they were based on Deloitte's conclusion that the lessees, that the return conditions would not create a material inducement for the lessees to exercise their purchase options. The court found that Exelon knew better than that. So your whole thing rides on this availability capacity.  And the other argument we've made in our brief is, as the tax court found, that Exelon was also aware that Winston was providing Deloitte and Stone & Webster with the conclusions it wanted to see in order to support its tax opinions. In fact, that was, again, planned from the start when PricewaterhouseCoopers explained that the tax risk would be addressed by obtaining opinions from experts. How is Exelon supposed to know that? A, and B, these were sophisticated players. They knew what Exelon wanted to do. They already knew what the criteria were. This is the law firm telling the client it's hard to do the work, hard to give the report. Well, this is what we're looking for. Tell me if this matches it. It's not necessarily saying that you must find. We want you to be dishonest in your conclusions. So there's two things. How do you think Exelon knew? And then I'm skeptical that you think that Winston Strang was behaving improperly. So we cited in our brief to an email exchange that establishes that Exelon actually facilitated the exchange of appraisal conclusions that Winston wanted to see and provided those to both Stone & Webster and Deloitte. So we've cited the email exchange in the record where that occurred. And Exelon actually suggested a phone call between all of them so that they could make sure they were all on the same page. So Exelon was aware that those conclusions were being provided to Deloitte. And then in turn, Winston & Strang relied on those very conclusions to issue a favorable tax opinion. Well, where do you start? There's a certain amount of—obviously, they spent a lot of money, et cetera, trying to get all of this put together and then to say that this is, I guess, overwhelming that they get this $83 million penalty when, in fact, they obviously made a big effort. Now, you could say, well, that was a big effort to evade taxes. I call it more of a deferment. But the fact that experts agree with each other and double-check and that sort of thing, is that some kind of an implication of fraud? Or is that more like good business practices in order to coordinate and to find out where there may be some mistakes here and there? With those three experts, all of them combining, it's kind of substantial. Well, I think what the tax court found was that it interfered with the integrity and the independence of Deloitte as the appraiser. And so Deloitte reached these conclusions, but it had been improperly influenced, and its independence had been compromised. And then Winston & Strang turned around and relied on those same conclusions that it had supplied to Deloitte in order to issue favorable tax opinions. So what evidence is there in the record that the taxpayer knew about this communication, which is at page 20? It starts at page 22. Yes, so it's page 362. The email exchange that I referred to is in the supplemental appendix, page 362 to 365. That's where the conclusions were transferred and were excellent facilitated, that transfer. You mean that email is what distorts or something, or changes an opinion or qualifies an opinion? It shows that it was an email from Winston & Strang that was attaching proposed conclusions for the appraisal that Winston & Strang emailed to Stone & Webster first, which was then shared with Exelon. Exelon concluded that most of the appraisal conclusions actually pertained to Deloitte and forwarded them to Deloitte. And then they had a conference and discussed it so that they were all on the same page. That's what the email shows, is just how the conclusions were transferred from Winston to Deloitte. Well, it seems to me when experts sort of share things, they're maybe trying to come up with the right answer. I don't want to be too far off, but yeah, they could say, well, that has an influence. And experts do get together. Sometimes even lawyers get together and talk something over and kind of shift things around one side and the other. That's why I'm wondering, is there something that just has to be absolute here? Well, there is a finding by the court that because of this exchange, well, and also the transcript, there's testimony, as the court found, that there was substantial back and forth and feedback, and that Winston & Strang provided regular feedback to Deloitte throughout the process, including reviewing drafts of the appraisals. And what the court found was that all of that combined together was an attempt to obtain certain results and not merely an attempt. It crossed that bridge. It was an attempt to obtain certain results, the court found. As opposed to what? As opposed to merely advising Deloitte what facts might be legally significant. So it was a finding by the court that Winston had crossed that line in interfering with the independence of Deloitte's appraisal. And I would note that the burden to establish reasonable cause and good faith, again, is on the taxpayer. The evidence that is in the record supports the court's finding that Winston crossed a line in attempting to obtain certain tax results. And if you look at Winston's proposed conclusions with the final conclusions in Deloitte's report, they are remarkably the same and almost verbatim, as the court pointed out in its opinion. So not only did Winston provide the questions, but it also provided the answers, and Deloitte included those answers in its final reports. The Federal Circuit noted in the Consolidated Edison case that Deloitte had issued over 100 appraisal reports in these silo and lilo transactions and had never once found that the exercise of the purchase option was not economically compelled. So the Federal Circuit concluded that those appraisals were merely boilerplate. Boilerplate? Oh, okay. Yes. I see my time is up. You can wrap up. The last thing I'd like to state is that the tax court was clear as to the standard, the correct legal standard to be applied, that reasonably likelihood means something more than just more likely than not. But instead, it adopted that standard as applied by the Federal Circuit and Second Circuit, which used other similar language to describe that standard, such as being where a prudent investor would reasonably expect that outcome. And so our position is that the reasonable likelihood standard is synonymous with a reasonable expectation of a certain outcome, and that that is the proper legal standard to be applied. Thank you, counsel. Mr. Mapp, rebuttal. Let me begin by answering your question. The penalties and the deficiency have been paid in full. Now, my friend starts his presentation here as they started their briefs and everywhere else with trying to compare this to all the other silo and lilo transactions. Well, they're not like all the other silo and lilo transactions in at least two critical ways. One, this is the only one of these that we're aware of that involves a like-kind exchange, and that means it's an effort at deferral of taxes. It's not this effort where somebody comes into your office and says, hey, do we have a deal for you? We're going to transfer some benefits and you're going to evade some taxes by getting a deduction from somebody else. This really is a different dynamic. This all started with a very real transaction in which we made more money than we thought we would. We were trying in good faith to take advantage of 1031 of the tax code. I don't think there's anything nefarious about that. So that's one way it's very different. The second way it's very different is if you look at all these other circuit cases, one thing you'll notice, Altria, BB&T, Consolidated Evidence, Wells Fargo, those cases don't involve penalties. This case, even though I would say that it's the least innocuous of these transactions because it starts out and it's different and it starts out with an effort to execute a like-kind exchange, it's the one where they're seeking penalties, and I think the penalties are really out of bounds here, and I'll get back to it. As to what the record says about the return conditions, there's no citation at page 171 of the opinion as to what we knew, and you don't have to, like, search through this whole record. The tax court tells you at page 142, although the parties did not submit any evidence regarding the amount CPS would be required to invest in the Spruce Station to meet the return standard. If that's the key thing to both the deficiency and the penalties, you need some evidence. You can't impose a $400 million deficiency and $90 million in penalties on no evidence at all. The rest of this stuff is ambiguous. Actual, actual doesn't solve it. You can have actual capacity or actual availability. Obsolescence doesn't solve it because obsolescence, a plant can become obsolete because of market conditions. You can put all the nice retrofits you want, but a coal plant is not going to have a high availability, a capacity factor rather, in a market where coal prices are high and natural gas prices are low. Just to finish on the penalties issue, one other finding of the tax court that shouldn't be lost in this is at page 16, he finds that Exelon needed expert advice. So to say that we needed expert advice to execute this transaction, but we can't rely on it because something as subtle as the Winston and Strawn Deloitte exchanges, when the only testimony on this record is from Hughes at page 133 of the opinion, where our expert says that Deloitte complied with the relevant professional standards. I just don't think you can impose penalties on us for that. And just to finish, there's one case that we did not cite, but I found in the preparation for argument, that's directly relevant for this point, so I'll just give you the citation. It's the DHL case from the Ninth Circuit. It's 285 F3, 1210, and it's a case where the tax court was reversed on penalties for DHL providing too much advice to its accounting firm, and that was a case where DHL was making the communications directly. So this case, where it's Winston and Strawn, I think is up for sure. Do you disagree that the supplemental appendix pages that Mr. Christensen cited to show that your client knew about this or alleged interference between Winston and Deloitte? I agree that they knew about the communications, but I think the relevant question is, did they know that those communications were improper? And there's no evidence for that, and indeed, again, the only evidence in this record that I've been able to find is the testimony of our expert, Hughes, that goes into before Judge Laro and says that Deloitte complied with the USPAP guidelines. So just, again, to be as clear as I can, I don't contest that Exelon knew those communications happened, but I think the relevant test for penalties is whether they knew that there was something inappropriate about them such that they could not reasonably rely on the appraiser. Thank you, Mr. Clement. The case is taken under advisement.